**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **DAVID M. RUTTENBERG, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:06cv639** |
| | ) | |
| **FRANK JONES, et al.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

In this § 1983[1] suit, plaintiffs, former owners of a Manassas Park, Virginia pool hall, allege that a June 2, 2004, warrantless administrative search of their property violated their Fourth Amendment rights because it was unreasonably conducted. Specifically, plaintiffs allege that the search, which was part of a joint operation with a multi-jurisdictional drug task force seeking to arrest narcotics traffickers who had sold drugs at the pool hall, was unreasonably conducted because the size, scope, duration, and manner of the search unreasonably threatened the pool hall's patrons and employees. Defendants, the City of Manassas Park, its chief of police, two police detectives, a former confidential police informant, and the Manassas Park mayor, move for summary judgment on four grounds. Specifically, defendants argue (i) that certain plaintiffs lack Article III standing to bring their Fourth Amendment claims; (ii) that the warrantless administrative search was constitutionally reasonable in the circumstances; (iii) that even assuming the search was unconstitutional, these defendants cannot be held liable based on direct, bystander, supervisory, or municipal theories of liability; and (iv) that the individual officer defendants are entitled to qualified immunity because plaintiffs' asserted constitutional rights were not clearly established at the time

_____

[1] 42 U.S.C. § 1983.

-1-

of the search. Plaintiffs filed a timely response in opposition, and the matter having been fully briefed and argued, is now ripe for disposition.

For the reasons that follow, defendants are entitled to summary judgment as to plaintiffs' Fourth Amendment claims, with plaintiffs' remaining pendent state-law claims to be dismissed without prejudice. Specifically, because the administrative search of plaintiffs' property was reasonably conducted, it did not violate their Fourth Amendment rights. Accordingly, plaintiffs' complaint must be dismissed.

**I**[2]

A.    **The Parties**

In 1992, plaintiff Triple D Enterprises, Inc. ("Triple D"), a Maryland corporation owned by plaintiffs David Ruttenberg and Judith Ruttenberg, opened the Rack 'N' Roll Billiard Club ("RNR"), a pool hall in Manassas Park, Virginia. David Ruttenberg is a 10% owner of Triple D and served as RNR's general manager for all times relevant to this suit.[3] His mother, Judith Ruttenberg, is a 90% owner of Triple D and, unlike her son, was never involved in RNR's day-to-day operations.

Defendant City of Manassas Park ("City") is an incorporated Virginia municipality that controls the Manassas Park Police Department ("MPPD"). Since 2002, defendant Chief John Evans ("Chief Evans") has served as the City's chief of police. Both defendant Detective L, an MPPD

---

[2] The facts recited here are derived from the record as a whole and are largely undisputed. Where disputes exist, they are noted, and if material, the analysis proceeds on the assumption that the disputed fact is as plaintiff contends. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

[3] As RNR's general manager, David Ruttenberg drew a salary of approximately $50,000 to $60,000 each year between 1993 and 2004. The record reflects that at some point in late 2003, after Hurricane Isabel damaged his Maryland home, he began to live in RNR's upstairs office.

officer, and defendant Detective W, an officer with the neighboring Prince William County Police Department ("PWCPD"), have served with their respective departments since the late 1980s. At all times relevant to this suit, Detectives L and W were also members of the Narcotics Task Force ("NTF"), a twelve-to-fifteen officer joint task force formed by the MPPD, PWCPD, and Manassas City Police Department ("MCPD") in June 2002 to investigate narcotics distribution in Manassas, Manassas Park, and Prince William County.[4] Finally, defendant Thomas Kifer ("Kifer") is a former RNR security officer who worked for the NTF as a confidential informant at various times relevant to this suit, and defendant Frank Jones was elected as the City's Mayor after the June 2, 2004, search of RNR.

## B.    RNR's Business

The record reflects that RNR, which was located in a Manassas Park shopping center,[5] had a maximum legal occupancy of approximately one hundred fifty persons. At all times relevant to

---

[4] The written agreement forming the NTF provides, *inter alia*, (i) that all NTF officers are to report to the PWCPD Vice/Narcotics Bureau Commander, (ii) that all NTF personnel must follow PWCPD policies and procedures, (iii) that all MPPD and MPD officers must follow their own department's policies, (iv) that all other chain-of-command responsibilities within each officer's department remain otherwise unchanged, and (v) that the departments' chiefs of police are expected to resolve any conflicts in policy. Moreover, the NTF agreement reflects that the PWCPD provides the vast majority of NTF logistical support, and it further reflects that the City only received two percent of all assets seized by NTF operations.

It is worth noting that Detective L was the only MPPD officer assigned to the NTF. Although the MPPD paid his salary, the record reflects that for NTF purposes he reported directly to PWCPD 1st Sgt. Rich Cundiff, who in turn reported to PWCPD Lt. Lanham and ultimately to PWCPD Maj. Colgan. Although Detective L reported to 1st Sgt. Cundiff, Lt. Lanham, and Maj. Colgan for NTF operations, he was expected to maintain contact with MPPD Maj. Mark Matthews, and the record reflects that Chief Evans still maintained chain-of-command authority over Detective L.

[5] Triple D sold RNR in April 2008, nearly four years after the events at issue, and nearly two years after this suit was filed.

this suit, RNR's premises, rectangular in shape, stretched in length from a front shopping center entrance to a rear alley exit. RNR's interior included, *inter alia*, (i) at least ten standard-size pool tables, (ii) several large video game consoles, (iii) several foosball tables, (iv) at least nine circular tables with accompanying bar stools, (v) a number of large-screen televisions, (vi) a bar extending down approximately half the length of one side of its main room, (vii) an elevated stage for dancing, (viii) a disc-jockey booth, (ix) men's and women's restrooms, and (x) an upstairs office. In 1993, RNR applied for, and received, a Virginia Alcoholic Beverage Control ("ABC") license to sell beer to its patrons. David Ruttenberg testified at his deposition in this matter that RNR sometimes remained open twenty-four hours, but typically closed at 2:00 a.m. or 3:00 a.m. on weekdays and *circa* 5:00 a.m. on weekends. In 2000, in response to a burglary and some domestic disputes that occurred in RNR's parking lot, David Ruttenberg installed a security camera system. Specifically, he installed sixteen cameras in and around RNR, each of which filmed two frames per second. The system's video feed was monitored and recorded in RNR's upstairs office.

C.     **Illegal Activity at RNR and the NTF's Investigation**

Between November 2003 and June 2004, MPPD officers responded to approximately forty-one calls of varying nature in or around RNR, including approximately twelve calls reporting fights or disorderly conduct, ten reporting patrons' excessive intoxication, and two reporting drug distribution activity. Ten arrests resulted, including six occurring inside RNR. The record reflects that RNR was cooperative with law enforcement on each occasion police responded to a call; indeed, the record reflects that at least twelve of the forty-one calls were made by RNR employees.[6]

---

[6] Although plaintiffs contend that they made many of the calls because intoxicated patrons from a neighboring bar, the Golden Phoenix, attempted to or did enter RNR, plaintiffs do not dispute that the calls and arrests were made, nor do they dispute that the Golden Phoenix was

In January 2004, the NTF began investigating reports of illegal drug sales in or around RNR. Specifically, the NTF assigned Detective W to conduct undercover surveillance inside RNR, and it assigned Detective L to serve as the case agent supervising Detective W. During a forty-three day span from late February 2004 to early April 2004, Detective W, acting undercover as an RNR patron, purchased or arranged to purchase illegal narcotics in or around RNR on eight occasions. Detective W's notes, included in this record, recount the following attempted or completed drug transactions:

- On February 24, 2004, Detective W negotiated marijuana deals with three different individuals—Jeffrey Price, Eric Golden, and Christopher Price—inside RNR. Thereafter, Detective W received the marijuana for one sale near RNR's restrooms, and he received the marijuana for the other two sales in RNR's parking lot.

- On February 27, 2004, Detective W negotiated and completed a marijuana purchase from Jeffrey Price inside RNR.

- On March 3, 2004, Detective W negotiated a marijuana deal with Jeffrey Price and Andrew Kinsley inside RNR and thereafter received the marijuana in RNR's parking lot.

- On March 10, 2004, Detective W negotiated and paid for a cocaine deal with Jason Brooke inside RNR, but never received the cocaine.

- On March 24, 2004, Detective W negotiated and paid for a marijuana deal with Jeffrey Price inside RNR and thereafter received the marijuana in RNR's parking lot.

- On April 5, 2004, Detective W negotiated and paid for a marijuana deal with Jeffrey Price inside RNR and thereafter received the marijuana in RNR's parking lot.

- On April 8, 2004, Detective W negotiated a marijuana deal over the phone with Jeffrey Price and thereafter received the drugs from Eric Golden in RNR's parking lot.

---

a neighboring establishment at all times relevant to this suit.

- On April 19, 2004, Detective W negotiated a marijuana deal with Jeffrey Price and Eric Golden inside RNR, but never completed the transaction.

Detective L testified that he conducted undercover surveillance from an unmarked vehicle during at least seven of the transactions. Additionally, Detective W's notes reflect his belief that Jeffrey Price, who was directly involved in seven of the eight transactions, was an RNR employee[7] and that the other narcotics traffickers were RNR patrons.[8]

In addition to the eight drug transactions, Detective W also observed other ABC violations

---

[7] David Ruttenberg disputed this contention at his deposition, claiming that Jeffrey Price was not an RNR employee, but rather a homeless RNR patron who was occasionally paid by RNR to perform miscellaneous tasks. The distinction is immaterial, however, as it is undisputed (i) that Jeffrey Price was a regular RNR patron, (ii) that RNR paid him to do various tasks on the premises, and (iii) that he had a central role in seven of the eight drug transactions described by Detective W.

Plaintiffs also contend in their pleadings that Jeffrey Price was cooperating with police as part of the NTF investigation. During his deposition, David Ruttenberg cited as evidence an April 2004 confrontation with Jeffrey Price regarding reports that Price had been selling narcotics. Specifically, Ruttenberg testified that when confronted, Price claimed to be working with the police. Ruttenberg further testified that on one occasion he overheard Price having a conversation with someone Price claimed to be a police officer, and that Ruttenberg obtained the phone number and later matched it to a cell phone used by Detective L. Finally, plaintiffs point to an April 17, 2004, PWCPD intelligence report that reflects a conversation Price and an unidentified female had with police about a narcotics trafficker named Papa Denteh. Although this report indicates that Detective L was informed of this conversation, it does not suggest that Price was acting as any sort of confidential informant ("CI").

In the end, despite plaintiffs' allegations, the record does not reflect any credible evidence that Price was cooperating with police when the search at issue occurred. In fact, unlike Kifer, who was clearly acting as a CI on June 2, 2004, and whose arrest on that day was staged, Price was charged and convicted for the drug crimes for which he was arrested June 2, 2004.

[8] It is worth noting that David Ruttenberg testified that as of late April 2004, he had banned the other individuals involved in drug deals—Eric Golden, Christopher Price, Jason Brooke, and Andrew Kinsley—from RNR. The record does not reflect, however, that any law enforcement officials were aware that those individuals had been banned. Moreover, David Ruttenberg testified that he nevertheless observed Christopher Price and Andrew Kinsley in the general shopping center area—and thus near RNR—after the time Ruttenberg claims they had been banned from RNR.

during the same forty-three day span. Specifically, Detective W's notes indicate that he observed, *inter alia*, (i) women exposing their breasts on the dance floor on three separate occasions,[9] (ii) patrons who claimed to be underage drinking beer on one occasion, (iii) apparently underage patrons served beer without identification checks on four separate occasions, and (iv) patrons immediately outside RNR with open alcoholic beverage containers on one occasion. Detective L testified that he notified the ABC of most, if not all, of these violations.

### D.    Pre-Operation Planning and Briefing

At some point between April 19, 2004 and June 2, 2004,[10] Detectives L and W obtained arrest warrants for Jeffrey Price, Eric Golden, Christopher Price, and Jason Brooke based on those individuals' narcotics trafficking in and around RNR. On or about June 2, 2004, the NTF and the ABC decided to conduct a joint operation (the "Operation") at RNR for the dual purposes of (i) executing the four arrest warrants and arresting Andrew Kinsley based on probable cause and (ii) conducting an administrative ABC inspection.[11]

At some time prior to 10:00 p.m. on June 2, 2004, the NTF, ABC, and other law enforcement personnel held a pre-Operation briefing at the MCPD. The record reflects that Chief Evans,

---

[9] David Ruttenberg conceded at his deposition that women had flashed their breasts on RNR's dance floor, although he contended both that such instances occurred "almost exclusively the week of . . . Mardi Gras" and that he instructed his security personnel to curb the behavior. He also conceded that he sometimes encouraged female staff and patrons to dance on RNR's bar.

[10] Although Detective L testified that the NTF may have conducted some surveillance of RNR between April 19, 2004, and June 2, 2004, the record does not otherwise describe this surveillance, nor does it reflect that law enforcement obtained any relevant information from any such surveillance. The record does reflect, however, that the MPPD responded to five calls at RNR during that time period.

[11] The term "Operation," as used here, encompasses both the execution of the arrests and the performance of the administrative inspection.

Detective L, and at least six additional MPPD officers[12] were present.[13] A PowerPoint presentation was given at the briefing, and the presentation listed the following five objectives:

- "Secure all entrances/exits to the establishment";

- "Enter and attempt to identify individuals inside the establishment";

- "Arrest individuals wanted by the Task Force";

- "Arrest individuals who are obviously intoxicated or in violation of other State or City ordinances"; and

- "ABC violations will be handled by ABC agents[.]"

After several slides providing suspect descriptions, including some photographs, the presentation then described various personnel assignments as follows:

- Detective L, MPPD Det. Trevor Reinhart, and three other officers were to secure RNR's front area and locate suspects;

- Five officers were to secure RNR's rear area, locate suspects, and conduct staged arrests of Detective W and Kifer;

- Special Agent Loftis, MPPD Capt. Mark Matthews, and five ABC agents were to conduct the ABC inspection; and

- Six officers were to provide perimeter security outside RNR.

The presentation also advised all officers (i) that Detective L would make an announcement in RNR after the scene was secured and (ii) that after making arrests, officers were to contact Detective L for arrest paperwork and assignments. Because he was the lead case agent for the NTF's investigation, Detective L, one of several officers who spoke, briefed those present about the

---

[12] Those six officers were: (i) Det. Trevor Reinhart, (ii) Sgt. Jeffrey Shubert, (iii) Lt. Rupert Prinz, (iv) Capt. Travis Mosher, (v) Det. Howard Perry, and (vi) Lt. Siddiqullah Qazei.

[13] The record is unclear with respect to whether Detective W was present at the briefing.

individuals to be arrested.

The record further reflects that Detective L prepared a written operations plan (the "Plan") that further elucidated the information in the PowerPoint presentation and was distributed at the briefing. The Plan listed the five suspects with identifying information, and on the Plan's second page, a box was checked "No" next to the statement "Suspects [k]nown to be armed." The Plan's personal officer equipment checklist provided that officers were to bring, *inter alia*, (i) a duty weapon, (ii) a ballistic vest, and (iii) a raid jacket.[14] The Plan's personnel and assignment list included sixteen named individuals and approximately twenty-two personnel identified only by unit and department. The assignments labeled PWCPD 1st Sgt. Rich Cundiff as "Command," Detective L as "Case Agent," and Detective W as "Undercover." The Plan's final page summarized the NTF's ongoing investigation and then broke down the Operation into the following three phases:

### Phase One
Detective W[] will enter [RNR] and provide pre-entry intelligence. 1st Sergeant Jones and the rescue team have been briefed on this phase of the operation and will conduct this phase at the conclusion of this briefing.

### Phase Two
The [NTF] obtained arrest warrants for the suspects listed above for various [n]arcotics violations. At the appropriate time, Detective W[] will open the rear entrance door to aid in our entry. Detective W[] and the CI will be placed in handcuffs and transported out of the establishment. ABC Special Agent J.C. Loftis will conduct ABC checks throughout this operation. Detective W[] will assist with identifying wanted suspects.

### Phase Three
Once the establishment is secured, the arrest teams will attempt to locate the wanted suspects. If suspects are not located within the establishment, the arrest teams will attempt to locate the suspects at their residence or other possible locations.

---

[14] The Plan did not provide any detail with respect to the type of duty weapons to be used, nor did it list any sort of mask or other identity-concealing clothing.

In addition, the Plan included Detective W's hand-drawn diagram of RNR's interior.

The Plan's suspect descriptions provided that four suspects—Jeffrey Price, Eric Golden, Christopher Price, and Andrew Kinsley—were wanted for distribution of marijuana. Jason Brooke was wanted for obtaining money under false pretenses, and Jeffrey Price and Eric Golden were also wanted for conspiracy to distribute marijuana. The Plan also described criminal histories for the three suspects with prior records, alerting the officers to the following convictions:

- **Jason Brooke**: (i) felonious assault, (ii) distribution of marijuana, (iii) manufacture, sale, or possession of a controlled substance, and (iv) obstruction of justice;

- **Jeffrey Price**: (i) destruction of property and (ii) contributing to the delinquency of a minor; and

- **Christopher Price**: (ii) entering property with intent to damage, (ii) distribution of marijuana, and (ii) four counts of forgery/uttering.

Although Detective L testified that he prepared the Plan and spoke at the briefing, he also testified that he followed 1st Sgt. Cundiff's recommendations with respect to the number of officers to be used.[15] Chief Evans testified that he was not involved in the Operation's planning and indeed, that he was first invited to attend the briefing by PWCPD Maj. Colgan on the day of the Operation because it was to take place in MPPD's jurisdiction. Chief Evans further testified to his understanding, based upon attendance at the briefing, that PWCPD 1st Sgt. Cundiff and PWCPD Lt. Lanham were the managers of the Operation, and that Detective L was the case agent in charge of paperwork and identifying suspects.

Chief Evans, Detective W, and Detective L all testified that the Operation required sufficient

---

[15] It is worth noting that neither party deposed 1st Sgt. Cundiff. The only depositions taken by the parties were of Judith Ruttenberg, David Ruttenberg, Chief Evans, Detective W, and Detective L.

personnel to address safety concerns related, *inter alia*, to (i) the inherently confrontational nature of executing any arrest warrant; (ii) the general understanding that weapons may be involved when executing arrest warrants, particularly in cases involving alleged narcotics traffickers; (iii) the possibility of encountering intoxicated or disorderly patrons; and (iv) potential patron or employee use of makeshift weapons, including pool sticks, pool balls, and beer bottles. In addition, eight MPPD officers, including Chief Evans, provided sworn affidavits that are a part of this record indicating that they felt the number of officers used (approximately thirty-eight) was necessary to ensure officer and patron safety because, *inter alia*, (i) RNR had a maximum legal occupancy of one hundred fifty persons, (ii) officers needed to secure multiple areas in and around RNR, and (iii) the officers needed sufficient personnel to conduct both the real and the staged arrests. While it is clear the officers were genuinely concerned about these matters, the record also reflects they had no particularized suspicion that any individual inside RNR had a weapon on June 2, 2004, nor does the record show that any officer expected David Ruttenberg to resist the ABC inspection.

## E.      The June 2, 2004 Operation at RNR

At some point prior to 10:30 p.m. on Wednesday, June 2, 2004, Detective W, dressed in civilian clothing and wearing a wire, entered RNR. Between the time he entered and the time uniformed officers arrived at approximately 10:35 p.m., video recordings from RNR's security cameras show[16] Detective W speaking on a cell phone. In this regard, Detective L testified that he

_____

[16] The record reflects that on June 2, 2004, at least twelve of RNR's sixteen security cameras were operational. The record includes recordings taken during the Operation from five of those twelve cameras. Specifically, the record includes video recordings from cameras stationed in the following locations: (i) outside RNR pointing towards the front entrance (approximately twenty-five minutes), (ii) inside RNR pointing towards the front entrance (approximately nine minutes), (iii) inside RNR above the bar and pointing out towards RNR's pool tables and main room (approximately fifty-three minutes), (iv) inside RNR pointing from

recalled speaking to Detective W before entering RNR. Although the Plan suggests the conversation concerned pre-entry intelligence, neither Detective L, nor Detective W, recalled the substance of the conversation.[17]

At approximately 10:35 p.m., both marked and unmarked police vehicles arrived at RNR. At that time, at least seventeen to twenty patrons and employees were inside RNR,[18] and approximately six to ten individuals were outside on the sidewalk area near the front entrance. The only suspect present was Jeffrey Price, and David Ruttenberg was asleep in the upstairs office. Over the next minute, approximately twenty-three uniformed officers entered RNR. Approximately seven of those twenty-three officers wore black ski masks and all of the masked officers wore clothing that identified them as police officers. The record reflects that at least two of the masked officers—Detective L and Det. Reinhart—were MPPD officers, and the record further reflects that they wore masks to conceal their identities for various current and future undercover operations. No officers wore gas masks, SWAT-style helmets, or protective body armor. The video recordings show

_____

the main area towards the stage in the rear of the main room (approximately two minutes), and (v) inside RNR above the stage pointing towards the door leading to the upstairs office (approximately nine minutes). David Ruttenberg testified (i) that he reviewed all video recordings from all cameras on June 3, 2004, (ii) that the recordings made a part of this record are the only recordings he considered relevant, and (iii) that he did not preserve any other June 2, 2004, recordings.

[17] Plaintiffs contend that Detective W told Detective L during this conversation both that Jeffrey Price was the only suspect present and that approximately ten to twenty individuals were inside RNR. This is a speculative assertion, and is thus not assumed in plaintiff's favor. *See JKC Holding*, 264 F.3d at 465 ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

[18] RNR's computerized "point of sale" terminal reflected that when the police entered RNR, approximately 11 patrons were paying to play billiards, and the video recordings from inside RNR reflect at least six other individuals, including Kifer, Detective L, and at least two RNR employees, were also present.

that most, if not all, of the officers were armed, and one masked officer, MPPD Det. Reinhart, was the only officer carrying a shotgun.

On entering RNR, the initial wave of officers proceeded to various points throughout RNR's main room. The video recordings show that as they entered, their weapons were holstered. The recordings also show that Det. Reinhart carried the shotgun with both hands and held it across his abdominal area with the barrel pointing generally downward to his left. Approximately nine officers proceeded to RNR's rear area, where they conducted the staged arrests of Detective W and Kifer, and where they also secured the rear exits and restrooms. Approximately two to three officers proceeded to the upstairs office, and two to three officers identified and arrested Jeffrey Price. The remaining eight to ten officers spread throughout RNR's main room, and the video recordings reflect that they secured the scene and attempted to determine whether other suspects were present. In addition, two to three officers stood outside RNR's front entrance observing the patrons outside on the sidewalk. At approximately 10:37 p.m., nine additional officers entered RNR, many of whom the record reflects were ABC agents arriving to conduct the ABC administrative inspection. Less than a minute later, two officers left with Jeffrey Price in handcuffs, and just over one minute thereafter, two officers exited with Detective W and Kifer in handcuffs.

The video recordings reflect that throughout the Operation, no patrons ran, hid, or moved in any sudden manner. The recordings also reflect that at least one patron seated at the bar did not even rise from his barstool when the officers passed him, and most patrons simply stood or sat where they were and observed the officers as they moved through the area. Also evident from the recordings is that there were RNR patrons outside near RNR's front door either seated in chairs or standing. As the officers arrived, the recordings show that those patrons remained essentially as they

-13-

were. One such patron, who was talking on her cell phone as the officers arrived, continued to do so, while another patron, who was seated in the lap of a fellow patron when the officers arrived, elected not to move from this position as the officers deployed. Other than the real or staged arrests of Detective L, Kifer, and Jeffrey Price, the video recordings do not reflect any officer physically touching or pushing any patrons or employees at any time during the Operation.

After Jeffrey Price, Detective L, and Kifer were removed from the premises, the video recordings depict a relatively uneventful administrative inspection lasting for approximately fifty minutes. Specifically, between 10:37 p.m. and approximately 11:28 p.m., the recordings show officers engaged in essentially four different tasks: (i) providing perimeter and observational security for the ongoing ABC inspection, (ii) conducting the ABC inspection[19] behind RNR's bar, (iii) checking patrons' identification, and (iv) conversing with various patrons and employees. At approximately 10:40 p.m., the officers brought David Ruttenberg to the bar to ask him about his ABC and other sales records, and at approximately 10:50 p.m. he led them to RNR's upstairs office, where the officers conducted an inspection for ABC violations. Over the inspection's remaining thirty-eight minutes, the number of officers gradually dwindled to fewer than ten officers, with the last officers departing at approximately 11:38 p.m. The entire Operation—the arrests and the administrative inspection—lasted no more than fifty-four minutes.

Plaintiffs contend that despite the uneventful nature of the Operation as shown by the video recordings, officers unreasonably threatened both patrons and employees upon entering the premises

---

[19] It is worth noting that plaintiffs' complaint concedes that the ABC inspection uncovered at least one ABC violation, and it is also worth noting that the ABC ultimately revoked RNR's license in June 2005 after learning of the violations uncovered during Detective W's investigation and the Operation.

and during the ABC inspection. Distilled to their essence, plaintiffs' contentions are as follows:

(i)      that the first masked officer to enter pointed a gun at RNR bartender Josh Clare as that officer approached RNR's bar;[20]

(ii)     that when several officers entered David Ruttenberg's upstairs office, the lead officer pointed a pistol at Ruttenberg and said, "Mr. Ruttenberg, please get out of bed, we need you to come downstairs," and then re-holstered the pistol;

(iii)    that Det. Reinhart pointed a shotgun at both patrons and employees throughout the Operation; and

(iv)     that RNR patrons and employees were ordered not to move, searched, and questioned during the course of the Operation.

First, with respect to bartender Clare's assertion, the video recordings depict a masked officer briefly pointing with a gloved hand as he approached the main counter. In this respect, plaintiffs point to Clare's sworn affidavit, which contends that the officer "pointed an automatic pistol at [his] face[.]" Although the video recording casts significant doubt on this contention, it is appropriate at this stage to assume this disputed fact in plaintiffs' favor.[21] *See JKC Holding Co. v. Wash. Sports Ventures,*

---

[20] Plaintiffs contend in their pleadings and interrogatory responses that this masked officer was Detective L, but they provide no factual basis for that contention, and it is thus inappropriate to assume that contention's truth at this stage. *See JKC Holding*, 264 F.3d at 465. In this respect, although David Ruttenberg testified during his deposition that Clare recognized Detective L's voice, Clare's sworn affidavit in this record does not mention the officer's voice, nor does it assert knowledge of the officer's identity. Moreover, Detective L testified during his deposition that he was not that officer. Detective L based this testimony on the facts that the first masked officer wore khaki pants and that Detective L recalled wearing black pants during the Operation. In this regard, Detective L identified himself on the recordings as a masked officer who appears later in the recordings wearing black pants.

[21] Specifically, defendants contend that the officer wore black gloves and merely pointed at Clare with his hand. And it is true that the recordings' depiction of the officer's subsequent actions appears to support defendants' position, namely that as he brings his hand back down to his waist and turns, he does not appear to be holding or holstering a weapon. In this regard, however, the video recording is insufficiently clear to determine that defendants are correct.

*Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Second, David Ruttenberg's testimony that the first officer upstairs pointed a gun at him will be assumed to be true at this stage, as there is no video recording of this alleged event. *See id*. Third, several patron and employee affidavits claim that an officer "pointed" a shotgun at them or in their general direction without describing the manner in which the shotgun was pointed. Yet, as David Ruttenberg conceded during his deposition, the video recordings depict Det. Reinhart "just scanning [the shotgun] around the room" and not "pointing it at anybody in particular." Thus, while it is necessary at this stage to assume that Det. Reinhart held the shotgun in a manner that caused the patrons who claimed he pointed it at them to believe he was doing so, the video recordings do not support plaintiffs' claim that he did so either intentionally or in an unreasonably threatening manner. Rather, the recordings show that Det. Reinhart carried the shotgun either held across his abdominal area with the barrel pointed generally downward to his left or slung over his shoulder with the barrel pointed straight at the ground or straight up in the air. The recordings show that he never put his finger on the trigger, raised the shotgun to his shoulder, or otherwise held it in a firing position. And finally, plaintiffs have included several patron and employee affidavits to the effect that they were searched,[22] told where to sit or stand, only permitted to use the restroom with officer escorts, or questioned during the Operation.[23] In this respect, the video recordings reflect that several RNR employees moved to an area in the center of the room, and

_____

[22] Specifically, one patron claims that she was searched inside RNR, and another patron claims that he was searched outside in RNR's parking lot.

[23] Defendants counter by pointing to several sworn MPPD officer affidavits claiming that they neither ordered patrons against walls, nor engaged in any dangerous or physically threatening behavior. Of course, because it is necessary at this stage to resolve all factual disputes in plaintiffs' favor, it is necessary to assume these events unfolded as claimed in the affidavits cited by plaintiffs. *See JKC Holding*, 264 F.3d at 465.

the recordings also reflect that most patrons stood near the walls of the main room. The recordings depict officers checking several patrons' identification and having apparently calm conversations with them. It does not depict any officers patting down or otherwise physically touching patrons or employees, and by 11:00 p.m., the patrons either began to leave or returned to their prior activities.[24]

As for the roles of the individual defendants, the undisputed record reflects that Chief Evans never entered RNR's premises, that he did not arrive until after the Operation began, and that, as he testified, he left the area after standing outside RNR for fifteen or twenty minutes. The undisputed record also reflects that Detective W left RNR in handcuffs approximately three minutes after the Operation commenced. Detective L testified during his deposition that upon entering RNR, he proceeded to the rear of the main room and made an announcement from the disc-jockey booth, after which he only remained in RNR until shortly before 10:39 p.m. Plaintiffs, on the other hand, contend that Detective L was in and out of RNR until at least 11:09 p.m. Because the video recordings show masked officers inside RNR until at least 11:09 p.m., including some wearing black pants as Detective L testified he wore, it is necessary at this stage to assume that Detective L was inside RNR for at least the first thirty-five minutes of the Operation—the execution of the arrests followed by the initial stages of the administrative inspection. *See JKC Holding*, 264 F.3d at 465.

In sum, the record reflects that the Operation lasted approximately fifty-four minutes, that

---

[24] Specifically, at approximately 10:52 p.m.—seventeen minutes after the first officers entered—the video depicts at least one patron beginning to roll pool balls around on the table where he is standing, and by approximately 10:57 p.m., patrons began either paying their bills or resuming their games. By approximately 10:59 p.m., patrons began to leave RNR's front sidewalk area, and by 11:00 p.m.—twenty-five minutes after the officers arrived—at least one patron resumed drinking at the bar.

approximately thirty-eight law enforcement officials participated,[25] that the bulk of the Operation was devoted to an ABC administrative inspection, and that RNR's patrons and employees were inconvenienced for no more than the first twenty-five minutes of the Operation. The record further reflects that no patrons or employees were physically harmed, injured, or mistreated, and that everyone at RNR on June 2, 2004—patrons, employees, and law enforcement officials alike—behaved calmly. In other words, the record reflects that the Operation, despite being an inconvenience for all, was carefully planned, quickly executed, and essentially unremarkable.

**F.      RNR's Alleged Decline**

David Ruttenberg testified that the day after the Operation, a local newspaper published a story with a headline about a drug bust at RNR. He also testified that although he was not physically harmed during the Operation, the resulting stress and RNR's alleged decline in business[26] caused him to suffer sleeping problems and chest pains. He further claims that these health problems led to medical bills totaling more than $15,000. Moreover, he testified that his RNR salary fell from $50,000 in 2003 to $25,000 in 2004, and that as of 2005, he no longer drew any salary. He also claims that the negative publicity associated with the Operation made it difficult for Triple D to sell RNR and that when RNR was finally sold in April 2008, Triple D did not receive what he and Judith Ruttenberg had expected based on their prior investments. During her deposition, Judith Ruttenberg

---

[25] Plaintiffs' claims in their pleadings that a larger number of officers participated are not supported in the record.

[26] Of course, it is worth noting that according to MPPD records, MPPD officers responded to thirty-nine calls at RNR in the nearly eleven months between June 2, 2004 and April 19, 2005. Although this reflects somewhat fewer calls than the forty-one between November 1, 2003, and June 2, 2004, the relatively consistent volume of police activity at least suggests that RNR had not necessarily suffered as harsh a decline as plaintiffs claim.

did not testify that she suffered mental anguish or physical harm as a result of the Operation, but she did claim that as a result of the Operation, she believes she lost profit she otherwise would have gained when Triple D sold RNR.

## G.     Procedural History

On June 1, 2006, nearly two years after the Operation, plaintiffs filed the instant complaint, alleging that plaintiffs are entitled to money damages from defendants under § 1983. Specifically, plaintiffs alleged the following § 1983 claims:

(i)     a substantive Due Process claim ("Count I") (against all defendants);

(ii)    a First Amendment (made applicable to these defendants by the Fourteenth Amendment) claim ("Count II") (against all defendants except Mayor Jones);

(iii)   a Fourth Amendment (made applicable to these defendants by the Fourteenth Amendment) claim ("Count III") (against all defendants except Mayor Jones);

(iv)    an Equal Protection claim ("Count IV") (against all defendants except Kifer); and

(v)     a claim for conspiracy to violate plaintiffs' substantive Due Process rights ("Count V") (against all defendants except the City).

In addition to these federal claims, plaintiffs alleged three state-law claims against all defendants except for the City: (i) tortious interference with contract ("Count VI"); (ii) common law civil conspiracy ("Count VII"); and (iii) business conspiracy, in violation of Va. Code §§ 18.2-499–500 ("Count VIII").

Defendants promptly moved to dismiss plaintiffs' § 1983 claims for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P., and on grounds that the individual defendants are entitled to qualified immunity. On December 13, 2006, defendants' motion was granted; specifically, Counts I, II, IV, and V were dismissed with prejudice for failure to state a claim, and Count III was

-19-

dismissed with prejudice on qualified immunity grounds. *Ruttenberg v. Jones*, 464 F. Supp. 2d 536 (E.D. Va. 2006). Plaintiffs' state-law claims were accordingly dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c). *Id.* at 551. The ruling with respect to plaintiffs' Fourth Amendment claim (Count III) was that "assuming, without deciding" that the Operation constituted an unreasonable administrative search in violation of plaintiffs' Fourth Amendment rights, defendants were entitled to qualified immunity on the basis that the constitutional right at issue was not clearly established at the time the alleged violation occurred. *Id.* at 550.

Plaintiffs appealed the dismissal of all counts, and on June 17, 2008, a Fourth Circuit panel affirmed in part and reversed in part. *See Ruttenberg v. Jones*, 283 F. App'x 121 (4th Cir. 2008) (per curiam) (unpublished). Specifically, the panel affirmed the dismissal of Counts I, II, IV, and V, and it reversed the dismissal of Counts III, VI, VII, and VIII. *Id.*[27] With respect to Count III, the panel held that this Court erred in its application of *Saucier v. Katz*, 533 U.S. 194 (2001). *Ruttenberg*, 283 F. App'x at 132. Specifically, the panel held that *Saucier* required district courts to determine *first* whether a violation of a plaintiff's constitutional rights occurred and only *then*, where a violation of a constitutional right is found, to proceed to determine whether that right was "clearly established" at the time of the alleged violation. *Id*. The panel then addressed plaintiffs' three bases for their Fourth Amendment claim—namely, that defendants violated plaintiffs' Fourth Amendment rights (i) because the Operation was a pretext for a purely criminal investigation; (ii) because the Operation exceeded the scope of 3 Va. Admin. Code § 5-50-70(B) (2008), which authorizes

---

[27] Because it reversed the dismissal of Count III, the Fourth Circuit panel also reversed the dismissal of Counts VI, VII, and VII—the state-law claims—so that this Court could "again consider its supplemental jurisdiction . . . ." *Ruttenberg*, 283 F. App'x at 139 n. 4. The panel did not address the merits of the state-law claims.

administrative ABC inspections, when it extended to David Ruttenberg's private office; and (iii) because the Operation was an unreasonably conducted administrative search. *Id.* at 132–136. The panel explicitly rejected the first two, holding that the complaint failed to allege a constitutional violation in either regard. *Id.* at 134, 135.[28] The panel accepted the third theory, however, and held that plaintiffs' complaint pled sufficient facts to allege a constitutional violation on the basis of an unreasonably conducted administrative search. *Id.* at 136. Accordingly, the panel held that plaintiffs' complaint survived defendants' motion to dismiss because the then-existing record did not reveal "enough about the circumstances surrounding the search and its execution to determine whether the inspection was reasonably conducted and, if not, whether qualified immunity is appropriate." *Id.*

On remand, an Order issued directing the parties to conduct limited discovery with respect to "whether defendants' June 2, 2004, search of plaintiffs' property was reasonably conducted . . . ." *Ruttenberg v. Jones*, No. 1:06cv639 (E.D. Va. Aug. 8, 2008) (Order). After discovery in this regard, defendants filed the instant motions for summary judgment, pursuant to Rule 56, Fed. R. Civ. P. Specifically, Chief Evans, Detective L, and the City (collectively, "City Defendants") argue that they are entitled to summary judgment because (i) neither Judith Ruttenberg, nor David Ruttenberg, have constitutional standing to assert Count III against any of the City Defendants; (ii) the Operation was conducted in a constitutionally reasonable manner; (iii) the record does not support theories of direct, bystander, supervisory, or municipal liability against these defendants; and (iv) even if a constitutional violation of plaintiffs' Fourth Amendment rights occurred for which Chief Evans or

---

[28] The Fourth Circuit panel's rejection of plaintiffs' allegation that the Operation was pretextual renders plaintiffs' allegations regarding the officers' subjective intentions, including Detective L's alleged grudge against David Ruttenberg, irrelevant to this motion.

-21-

Detective L could be held liable under direct, supervisory, or bystander liability theories, they are nonetheless entitled to qualified immunity because the constitutional rights at issue were not "clearly established" at the time of the Operation.

Detective W also filed a motion to dismiss, arguing (i) that he did not violate plaintiffs' constitutional rights and (ii) that even if he did so, he is nonetheless entitled to qualified immunity because those rights were not "clearly established" at the time of the alleged violation. Plaintiffs filed a timely response in opposition to both motions, and the matter has been fully briefed and argued and is now ripe for disposition.

## II

The summary judgment standard is too well-settled to require elaboration here.  In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III

Defendants' motions for summary judgment present four questions. First, it is necessary to determine whether plaintiffs David and Judith Ruttenberg have Article III standing to assert Count III. Second, it is necessary to determine whether the Operation was an unreasonably conducted administrative search in violation of the Fourth Amendment. If so, it is then necessary to determine whether each defendant may be held liable for that constitutional violation. Finally, assuming the Operation was constitutionally unreasonable, it is necessary to determine, with respect to any

defendant officer who may be held liable in his individual capacity, whether that officer is nonetheless entitled to qualified immunity—in other words, whether the constitutional right alleged to have been violated was clearly established at the time of the Operation.

Each of these questions is separately addressed.

## A.    Standing[29]

First, defendants correctly do not contest Triple D's standing as a corporation to bring a § 1983 claim for damages resulting from a search of RNR's premises, in violation of Triple D's Fourth Amendment rights. In this regard, it is clear that a corporation has a Fourth Amendment right to be free of unreasonable searches of its property.[30] Yet, it is also clear that a corporation's shareholder—even a sole shareholder—does not have standing to assert the corporations's Fourth Amendment rights absent harm to an individualized, legitimate and reasonable expectation of privacy. *See Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 729 (8th Cir. 2001)

---

[29] Because the question of whether plaintiffs have Article III standing to bring a § 1983 claim is a jurisdictional issue, it must be addressed prior to adjudication of the remaining questions in this case. *See, e.g., Stephens v. County of Albemarle*, 524 F.3d 485, 490–91 (4th Cir. 2008) (Because § 1983 plaintiff bringing First Amendment claim lacks Article III standing, claim must be dismissed for lack of jurisdiction); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (holding that Article III jurisdiction is a threshold issue that must be addressed before merits questions).

[30] *See, e.g.,* 13D Charles Alan Wright et al., *Fed. Prac. & Proc.* § 3573.1 (3d ed. Supp. 2008) (corporation may vindicate its federal rights under § 1983); *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977) (observing that although "a business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context[,]" corporation's premises is protected by corporation's Fourth Amendment rights); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1096 (4th Cir. 1993) (addressing whether "evidence used against [corporation] at trial was obtained by an illegal search in violation of the corporation's Fourth Amendment rights"). *Cf. Cottom v. Town of Seven Devils*, 30 F. App'x 230, 232 n. 1 (4th Cir. 2002) (per curiam) (unpublished) (observing in *dicta* that district court dismissed plaintiff shareholders from § 1983 Fourth Amendment unreasonable search claim "because only corporate entities . . . can sue on behalf of corporations").

(sole shareholder lacked standing to bring Fourth Amendment § 1983 claim absent "alleged injury . . . distinct from that suffered by the corporation"), *panel opinion reinstated en banc*, 286 F.3d 498 (8th Cir. 2002).[31] Accordingly, David and Judith Ruttenberg only have standing to bring Count III for Fourth Amendment harms that are distinct from Triple D's.

In this respect, the record reflects no distinct harm to Judith Ruttenberg; she was not present during the Operation, nor did she have any expectation of privacy in RNR's premises separate and distinct from her interests as Triple D's dominant shareholder. Accordingly, Judith Ruttenberg does not have standing to assert the claim in Count III in her personal capacity.

By contrast, the record reflects sufficient evidence of a distinct harm to David Ruttenberg to give him Article III standing to assert the claim in Count III in his personal capacity. In this respect, it is clear that David Ruttenberg (i) was present during the Operation, (ii) essentially lived in RNR's upstairs office, and (iii) alleges that his personal Fourth Amendment rights were violated

---

[31] In *Audio Odyssey*, a corporation's sole shareholder and his wife lacked standing "for various emotional and reputational injuries stemming" from a violation of the corporation's Fourth Amendment rights because the claims did not assert a "distinct" injury "in which the *claimant's* rights [were] violated, [but was] merely one in which the claimant [was] indirectly harmed" because of injury to the corporation. *Audio Odyssey*, 245 F.3d at 729 (emphasis in original). *See also, e.g., Smith Seltzer & Sons, Inc. v. S. Car. Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994) (observing " 'fundamental rule' that '[a] shareholder . . . does not have standing to assert claims alleging wrongs to the corporation"); *Orgain v. City of Salisbury*, 521 F. Supp. 2d 465, 476 (D. Md. 2007) (citing *Smith Seltzer*, 20 F.3d at 1317) (limited liability company that owns nightclub, and not its shareholders or members, have standing "to claim damages for losses suffered by . . . nightclub" as a result of constitutional violations; limited liability company's members only had standing for "damages for emotional distress and for financial losses personal to them"); *Williams v. Kunze*, 806 F.2d 594, 599 (5th Cir. 1986) ("Unless the shareholder, officer or employee can demonstrate a legitimate and reasonable expectation of privacy in the records seized, he lacks standing to challenge the search and seizure."); *United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir. 1980) ("When corporate property is . . . searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the . . . area searched.").

when a police officer allegedly pointed a weapon at him as the officer entered RNR's upstairs office. Moreover, the record reflects that David Ruttenberg alleges he suffered damages separate and distinct from Triple D's lost profits, namely, he alleges he suffered various medical problems as a result of the violation of his Fourth Amendment rights. Accordingly, David Ruttenberg and Triple D have standing to bring Count III, while Judith Ruttenberg does not.

**B.      Fourth Amendment Analysis**

Before turning to whether the Operation violated the remaining plaintiffs' Fourth Amendment rights, a threshold matter merits brief mention. The Fourth Circuit panel decision remanding this case was based on the understanding that *Saucier*'s two-step analysis required district courts to address both steps, that is to decide first whether a constitutional violation occurred and, if so, only then to consider whether the right violated was clearly established at the time of the violation. Because the district court here skipped the first step by assuming without deciding that a violation had occurred, the Fourth Circuit panel reversed and remanded. *See Ruttenberg*, 283 F. App'x 121, *rev'g in part, aff'g in part, and remanding* 464 F. Supp. 2d 536. Since then, the Supreme Court, in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), reconsidered *Saucier*, holding that district courts have the discretion to proceed, as did the district court here, by proceeding directly to the second step of the *Saucier* analysis after assuming without deciding that a constitutional violation occurred. *Id.* at 818. Yet, this does not mean that it would now be appropriate to reissue the district court's original decision in this case. To the contrary, it would be inappropriate to do so because the question now presented is no longer whether plaintiffs' Fourth Amendment claim survives a motion to dismiss; rather, the question presented is whether, on the *now-developed record*, defendants are entitled to summary judgment on the Fourth Amendment claim. And based on the now-developed

record, it is appropriate to conduct the two-step *Saucier* inquiry and thus to address first whether a constitutional violation occurred.[32]

Another point that merits brief mention before commencing the Fourth Amendment analysis is that the Fourth Circuit panel reversed only the dismissal of Count III based on plaintiffs' third theory—"that the administrative search of RNR violated the Fourth Amendment because it was unreasonably executed." *Ruttenberg*, 283 F. App'x at 135. But because the record did not then reflect "enough about the circumstances surrounding the search and its execution to determine whether the inspection was reasonably conducted," the panel remanded the case for further proceedings. *Id.* at 136. Before doing so, however, the panel laid out as guidance "the boundaries of the inquiry" on remand. *Id.* This guidance is important.

    *(1)    The Remand Guidance*

---

[32] In this regard, it is important to recall that the Supreme Court overruled *Saucier* because, *inter alia*, its rigid order of inquiry often "create[s] a risk of bad decisionmaking" in certain contexts. *Pearson*, 129 S. Ct. at 820. Specifically, the Supreme Court found this risk particularly high where "qualified immunity is asserted at the pleading stage . . . [and] the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 819 (citations omitted). In other words, "the two-step inquiry 'is an uncomfortable exercise . . . where the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed.' " *Id.* at 819–20 (quoting *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69–70 (1st Cir. 2002)) (alterations in original). But where qualified immunity is raised at the summary judgment phase, and the factual record has been more fully developed, the risk of bad decisionmaking largely subsides. *See, e.g., Case v. Eslinger*, No. 08-10657, 2009 WL 196842, at *5 (11th Cir. Jan. 29, 2009) ("two-part inquiry of *Saucier* provide[d] the 'better approach to resolving' " appeal from summary judgment on qualified immunity where factual record was fully developed (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) and citing *Pearson*, 129 S. Ct. at 822).

Moreover, *Pearson* also recognized that where, as here, a § 1983 claim is also brought against a municipality, the qualified immunity defense is unavailable to that municipality, and thus it may be "worthwhile" for a district court to exercise its discretion and conduct the two-step *Saucier* inquiry with respect to individual officer defendants as well. *Pearson*, 129 S. Ct. at 822.

First, the panel observed that " '[t]here is no question that the Fourth Amendment prohibition of unreasonable searches . . . applies to the performance of administrative searches of commercial property.' " *Id.* at 138 (quoting *Turner v. Dammon*, 848 F.2d 440, 446 (4th Cir. 1988)) (first alteration in original). And although " '[t]he burden on law enforcement officials in conforming their conduct to Fourth Amendment standards is not great in the area of traditionally regulated industries' . . . it is a burden nonetheless." *Id.* (quoting *Turner*, 848 F.2d at 447) (first alteration in original). Thus, although a warrantless administrative search of RNR, part of the closely-regulated liquor industry, implicates a " 'particularly attenuated' expectation of privacy," the search must nonetheless be reasonable. *Id.* at 133 (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)). And where, as here, a plaintiff claims a warrantless administrative search, while justified, was unreasonably executed, "the guiding standard 'is whether, under the circumstances confronting the officers and disregarding their intent or motivation, their conduct was objectively reasonable.' " *Id.* at 136 (citing *Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir. 1999)) In this respect, the panel observed that "[b]ecause context matters when making such a determination, *per se* rules are seldom appropriate." *Id.* For example, "the number of officers present for the search, while undoubtedly relevant, is not by itself dispositive." *Id.* This is so, the panel noted, because "depending on the circumstances, it may be eminently reasonable for fifty (or more) police officers to participate in the search of a liquor establishment." *Id.* (citing *McNair v. Coffey*, 279 F.3d 463, 466 (7th Cir. 2002)). Thus, the panel noted that the inquiry on remand should balance, *inter alia*, the following factors:

    (i)        "the nature of the place searched";

    (ii)       "the number of people the officers expected to encounter";

    (iii)     "the likelihood that the officers would be met with resistance or defiance";

(iv)    "whether the search was unduly prolonged"; and

(v)    "the specific conduct of the officers involved, particularly whether they engaged in any unreasonably threatening behavior, such as an abuse of weapons or the causing of physical harm."

*Id.* at 137 (internal quotations and citations omitted). In addition, when balancing these factors, the panel observed that "it must be remembered that it is not a court's 'role to tell local governments how to conduct an administrative search.' " *Id.* (quoting *Crosby*, 187 F.3d at 1348). Indeed, "[s]o long as the officers behave[] reasonably, the discretion about how to best perform the inspection is theirs and theirs alone." *Id.* In this respect, because "the very term 'reasonableness' implies reasonable latitude and room for judgment[,]" it does not violate the Fourth Amendment where "officers 'act in a reasonable manner to protect themselves from harm . . . .' " *Id.* (quoting *Los Angeles County v. Rettele*, 550 U.S. 609, 127 S. Ct. 1989, 1993–94 (2007)).

To help guide the "highly fact-dependent " inquiry on remand, the Fourth Circuit panel also summarized three Eleventh Circuit decisions it found "instructive in determining whether, based on the totality of the circumstances, [the] administrative search was unreasonably excessive." *Id.* at 136, 137 (internal quotations omitted). First, in *Swint v. City of Wadley*, 51 F.3d 988 (11th Cir. 1995), the Eleventh Circuit found two nightclub searches unreasonable based on, *inter alia*, the following facts:

[T]he raids involved 30–40 officers, including eight SWAT team officers; the inspections lasted approximately one and one-half hours; during the search, officers pointed their weapons at club employees and patrons; the police grabbed and shoved one person against a wall and pushed another patron off a bar stool; threatening comments, such as "Shut up, or I'll shut you up myself," were made by officers to persons detained; and an officer, with his finger on the trigger, pointed a shotgun in someone's face.

*Ruttenberg*, 283 F. App'x at 137 (citing *Swint*, 51 F.3d at 992–93). As the Fourth Circuit panel observed, "such a 'massive show of force and excessive intrusion' could not be justified [in *Swint*]

-28-

as a reasonable part of [an] administrative search." *Id.* (quoting *Swint*, 51 F.3d at 999). Similarly, in *Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007), the Eleventh Circuit found an auto body shop administrative search was conducted unreasonably based on, *inter alia*, the following facts:

> The search there involved twenty law enforcement officers and lasted over eight hours. In addition, officers arrived in unmarked vehicles and surrounded the property to block the exits. They entered the premises with "automatic shotguns and sidearms drawn." Notably, one officer stuck a shotgun into an employee's back and continued to point it at him after the employee turned around. Other employees were "lined up along a fence and patted down and deprived of their identification."

*Ruttenberg*, 283 F. App'x at 137–38 (quoting *Bruce*, 498 F.3d at 1236, 1244–45)). The Eleventh Circuit "found that the 'massive show of force . . . , like that in *Swint*, is not the sort of conduct' " permissible in an administrative search. *Id.* at 138 (quoting *Bruce*, 498 F.3d at 1245). By contrast, in *Crosby v. Paulk*, 187 F.3d 1339 (11th Cir. 1999), the Eleventh Circuit found an administrative search was reasonably conducted based on, *inter alia*, the following facts:

> [F]orty law enforcement officers searched a pair of adjoining nightclubs for two hours. Notably, the officers "expected to encounter 500 to 700 patrons at the two nightclubs," including many who would be consuming alcohol. . . . Upon entering, the officers "ordered the patrons to remain where they were, and instructed people on the dance floor to sit on the floor and not to return to their tables." . . . The [Eleventh Circuit] found "no evidence that any officer involved in securing the nightclubs and conducting the investigation drew a weapon or threatened the arrestees or any patrons."

*Ruttenberg*, 283 F. App'x at 138 (quoting *Crosby*, 187 F.3d at 1343 nn. 4–5, 1348). Accordingly, the Eleventh Circuit found no " 'violation of a constitutional right in this context.' " *Id.* (quoting *Crosby*, 187 F.3d at 1352 (emphasis omitted)).

Finally, based on *Swint*, *Bruce*, and *Crosby*, the Fourth Circuit panel cautioned that "[i]t should be clear from the foregoing that any decision as to reasonableness rests on the particular circumstances of a case" and that although plaintiffs' "complaint survives a motion to dismiss, . .

. further factual development may show that no constitutional violation occurred." *Id.*

        *(2)     The Operation's Reasonableness*

These principles, elucidated by the Fourth Circuit panel in this case and applied here, point persuasively to the conclusion that the Operation was constitutionally reasonable. Specifically, given

    (i)      the nature of RNR as a late-night pool hall that served alcohol to its patrons and had a history of attracting and harboring unlawful activity,

    (ii)     RNR's maximum legal occupancy of one hundred fifty persons, and

    (iii)    the Operation's dual purposes of conducting an administrative inspection and arresting several known narcotics traffickers,

it was constitutionally reasonable for approximately thirty-eight officers to conduct a fifty-four minute operation that was relatively uneventful after its first few minutes, involved little, if any, brandishing of weapons, and caused no physical harm to any patrons or employees.

First, with respect to the nature of the place to be searched, the record reflects that based on what the officers knew about RNR, the Operation they planned and executed was reasonable. Specifically, the officers knew that RNR was a large pool hall that stayed open into the early morning hours, served alcohol to its patrons, and was a venue for negotiation of drug transactions. In other words, the record reflects that RNR posed numerous safety concerns, both for the officers conducting the Operation and for the patrons and employees present during the Operation. Indeed, RNR acknowledged as much when it decided to install a sixteen-camera security system in response to unlawful activity approximately four years before the Operation. Further, in the seven months leading up to the Operation, MPPD officers responded to forty-one calls for police assistance at RNR, including more than twenty involving either fights, excessive alcohol consumption, or drug distribution. Moreover, in a period of less than two months in early 2004, the year of the Operation,

Detective W arranged at least eight drug transactions at RNR, including seven with a regular RNR patron who was occasionally paid by RNR for miscellaneous tasks. And finally, Detective W observed numerous other unlawful acts inside RNR, including underage drinking and public nudity. In sum, given the nature of RNR's business, its history of unlawful activity, and the plan to arrest persons as part of the Operation, it was constitutionally reasonable for the Operation to employ approximately thirty-eight armed officers to ensure the safe and effective conduct of the administrative inspection and execution of arrest warrants on known narcotics traffickers.

The next factor, the number of people the officers expected to encounter, also supports a finding of reasonableness. Specifically, it is undisputed that RNR's maximum legal occupancy permitted up to one hundred fifty patrons—slightly less than four times as many officers as provided in the Plan. In this respect, it is entirely reasonable to provide for a roughly four-to-one ratio of officers to possible patrons in circumstances like those presented here. Indeed, the record reflects that the officers were assigned to—and generally adhered to—the Plan's various assignments. Moreover, the video recordings demonstrate that as tasks were accomplished and fewer officers were needed, the number of officers gradually dwindled, and that during the bulk of the administrative search, no more than twenty officers—and at some times, fewer than ten—were inside RNR. In sum, nothing about the officers' expectations regarding the number of people who would be present suggests this Operation was unreasonable, and in fact, the record shows that the Operation reasonably planned for the number of officers necessary to ensure a safe and orderly Operation.[33]

---

[33] Plaintiffs counter that Detective W should have observed that RNR was not at its maximum occupancy before the Operation commenced, relayed this information to Detective L, and that Detective L should have adjusted the Operation midstream to reduce the number of

Next, the likelihood of patron or employee resistance to the Operation also demonstrates that the Operation's safety precautions, including the number of officers and presence of weapons, were reasonable. In this respect, it is important to remember the dual-purpose nature of the Operation at issue. Specifically, it is undisputed that one of the Operation's purposes was to arrest four narcotics traffickers in a public place—a task that, given the inherently confrontational nature of arrest and the common relationship between narcotics trafficking and firearms, certainly justifies a significant and armed police presence. Moreover, three suspects had prior convictions, including one suspect's felony assault conviction. In addition, the NTF's investigation, which revealed multiple ABC violations and unlawful acts by RNR patrons, suggested that those patrons might well be consuming alcohol and have access to numerous makeshift weapons, including pool cues, beer bottles, and pool balls. In sum, given the risk of resistance on these facts, it was reasonable for the officers to enter RNR with a significant police presence that allowed the Operation to accomplish its objectives while protecting the safety of all involved.[34]

The next factor—whether the search was unduly prolonged—clearly demonstrates that the Operation, which lasted approximately fifty-four minutes, was reasonably conducted. Indeed, after the real and staged arrests were completed in the Operation's first few minutes, the Operation was

officers involved from the very start. Yet, given the specific officer assignments in the Operation's Plan, as well as RNR's size and nature, the Fourth Amendment does not mandate that the Operation be finely tailored to any last-minute information.

[34] Plaintiffs respond to these safety concerns by arguing that the officers did not have any particularized expectation of resistance from RNR employees or patrons. And although the Plan indicated the suspects were not known to be armed, and defendants acknowledge that the officers did not expect any particular resistance from David Ruttenberg regarding the administrative search, these facts demonstrate at most either that the officers' precautions may not have been entirely *necessary* or that *more* precautions may have been required in different circumstances. It does not follow, however, that *this* Operation was unreasonable given all the circumstances.

relatively uneventful and appears to have taken no longer than was reasonable to complete the ABC administrative inspection.[35] Indeed, by 11:00 p.m., approximately halfway through the Operation, patrons generally either resumed playing pool or left RNR. Accordingly, nothing about the Operation's length suggests that it was unduly prolonged.

Finally, the record does not does not reflect that the officers "engaged in any unreasonably threatening behavior, such as an abuse of weapons or the causing of physical harm." *Ruttenberg*, 283 F. App'x at 137. Indeed, although the video recordings confirm that the officers were armed, the recordings also demonstrate that the officers did not enter RNR with those weapons drawn. Defendants respond by arguing that the Operation's officers abused their weapons (i) because the first masked officer to enter may have momentarily pointed a gun at RNR's bartender, (ii) because the first officer to enter the upstairs office pointed a pistol at David Ruttenberg, and (iii) because Det. Reinhart carried a shotgun into RNR and held it in such a way that some patrons and employees believed it was pointed at them. These three contentions, however, even if true, do not constitute an "abuse" of weapons by the Operation's officers in these circumstances. Indeed, the first two allege momentary acts during the Operation's first few minutes which hardly rise to the level of weapon "abuse." With respect to Det. Reinhart, the video recordings show that he never held his finger on the shotgun's trigger, aimed the shotgun at any patrons or employees, or held it in a threatening manner. That some patrons and employees may have been nervous about the shotgun's presence is understandable, but such nervousness does not render the Operation unreasonable. Moreover, it is

---

[35] Plaintiffs' contention that the Operation was unduly prolonged because prior ABC inspections took less time is unfounded, as the record does not suggest that the prior ABC inspections were conducted in similar circumstances—late in the evening, during the simultaneous execution of multiple arrest warrants, and after a months-long investigation uncovering numerous ABC violations.

important to note that nothing in the record suggests that the officers' actions caused any physical harm to any RNR patron or employee. In sum, the officers' conduct during the course of the Operation was not unreasonably threatening; they physically harmed no one, made no verbal threats, and did not abuse their weapons.[36] Thus, although the Operation may have caused stress or anxiety[37] for everyone at RNR on June 2, 2004, the record simply does not reflect that the officers' conduct during the Operation was unreasonably threatening.

Accordingly, the factors set forth by the Fourth Circuit panel, applied here, clearly show that the Operation was conducted reasonably. Moreover, this conclusion is consistent with the results in *Swint*, *Bruce*, and *Crosby*. Indeed, this case is more analogous to *Crosby*, where, as here, the administrative search was reasonably conducted, than it is to *Swint* and *Bruce*, where the searches were held unreasonable. Specifically, in *Crosby*, as here, approximately forty law enforcement officials participated in a dual-purpose operation to execute arrest warrants and conduct an unannounced, nighttime warrantless administrative search of a large liquor-serving establishment.

---

[36] RNR patron Mark Sovich's affidavit appears to summarize the officers' conduct most accurately when he states that "[i]t was plain that [the Operation] was rehearsed and they had an objective. To my relief they obtained their objective and left me alone."

[37] In this respect, it is of little import that plaintiffs allege the officers searched one female patron's purse, required two female patrons to be escorted to the restroom, and briefly handcuffed one patron in the RNR parking lot. Importantly, because none of these individuals are plaintiffs to this suit, any officer action towards them is only relevant as proof of the reasonableness of the overall Operation. *See Crosby*, 187 F.3d at 1346 n. 10 (plaintiffs in § 1983 claim alleging unreasonably conducted administrative search "cannot assert Fourth Amendment claims based on governmental intrusions on the rights of others than themselves"); *Bruce*, 498 F.3d at 1244 n. 22 (Although business owner "may not assert the rights of his employees who may have been unconstitutionally searched, . . . [h]ow the officers treated the employees is relevant to [a] determination of whether the[] conduct exceeded the scope of a proper administrative inspection."). Accordingly, these isolated acts, even assuming they were unreasonable vis-á-vis those patrons, do not render the Operation unreasonable in its totality.

*Crosby*, 187 F.3d at 1342–43, 1347, 1348 n. 12 ("The consolidation of these law enforcement efforts was reasonable and not constitutionally offensive under the applicable law governing each.").[38] By contrast, in *Swint*, unlike here, law enforcement conducted *two* searches, each of which began with entry of an eight-officer SWAT team. *Swint*, 51 F.3d at 993. Further, during the course of the second search, unlike here, "law enforcement officials chambered rounds of ammunition into their weapons, pointed them, and ordered persons . . . to get down on the floor." *Id.* Moreover, in *Swint*, also unlike here, at least one patron was "grabbed[] and shoved against a wall[,]" another patron "was pushed off a bar stool[,]" still another patron had an officer "with his finger on the trigger[] point[] a shotgun" at the patron's face, and multiple employees "had guns *held* on them during th[e] raid, which lasted from one to one and one-half hours." *Id.* (emphasis added). In addition, unlike here, the officers in *Swint* made threatening statements during both raids—namely, a statement during the first raid telling a patron to "[s]hut up, or I'll shut you up myself" and a statement during the second raid that the officers "would be coming back and would not stop until the [c]lub was closed." *Id.*[39]

_____

[38] To be sure, there are some differences in the *Crosby* facts. There the search took twice as long, the officers encountered four hundred patrons, and there was "no evidence that any officer involved in securing the nightclubs and conducting the investigation drew a weapon or threatened the arrestees or any patrons." *Crosby*, 187 F.3d at 1343. That the officers in *Crosby* drew no weapons, as compared to the pointing of certain weapons suggested by this record, is an insufficient distinction to justify a different result, as the weapons handling here, even read in plaintiff's favor, was not unreasonable in the circumstances.

[39] It is true, of course, that the raids in *Swint* are factually similar to the Operation here in some respects—namely, *inter alia*, (i) that some of the officers in *Swint* wore ski masks to conceal their identities, (ii) that the searches in *Swint* were part of a narcotics task force investigation, (iii) that an undercover officer and confidential informant entered the facility prior to the search, and (iv) that some patrons were initially denied permission to use the restroom. *Swint*, 51 F.3d at 993. These similarities, however, are insufficient to justify the same result where, as here, the Operation consisted of a single search lasting less than an hour and involved no physical contact with patrons or employees, no verbal abuse, and minimal, if any, pointing or use of weapons.

Finally, in *Bruce*, unlike here, law enforcement arrived "with automatic shotguns and sidearms drawn" and detained employees during an *eight-hour* administrative search of an auto body shop with little to no reputation for unlawful activity. *Bruce*, 498 F.3d at 1243–44, 1246. In addition, also unlike here, the officers in *Bruce* carried multiple shotguns, ordered employees to line up against a fence, and pushed a shotgun barrel into one employee's back. *Id.* at 1236. In the end, the Operation at issue here, based on the totality of the circumstances, was simply not an unreasonably "massive show of force," as were the searches in *Swint* and *Bruce*. *Id.* at 1245; *Swint*, 51 F.3d at 999.

It is also worth noting that although there is no Fourth Circuit authority directly on point, what little Fourth Circuit precedent exists in analogous cases supports the result reached here. That case law focuses on the reasonable proportionality of the police action in response to the purposes of a search and the nature of the place to be searched. Specifically, in *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988),[40] the Fourth Circuit affirmed denial of summary judgment on qualified immunity grounds where genuine questions of material fact remained with respect to a § 1983 claim for an allegedly "disproportionate pattern" of administrative searches of a particular establishment. *Id.* at 445. In *Turner*, unlike here, the record contained "not a single police report documenting criminal complaints or activities, and no records of arrests[,]" and it was this "utter absence of objective justification for the highly disproportionate number of searches" that caused the Fourth Circuit to affirm denial of summary judgment. *Id.* It is instructive here to note, however, that the Fourth Circuit observed in *Turner* that even a "large and disproportionate number of searches" could be "objectively supported by numerous arrests, by reports of criminal activity . . . , or even by logs

---

[40] *Turner* was abrogated on other grounds by *Johnson v. Jones*, 515 U.S. 304 (1995). *See Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997).

detailing the subject of complaints by patrons, passerby, or neighboring establishments . . . ." *Id.* at 447. Also noteworthy is that a Fourth Circuit panel, in *Cottom v. Town of Seven Devils*, 30 F. App'x 230 (4th Cir. 2002) (per curiam) (unpublished), affirmed a district court's grant of summary judgment to defendants in a § 1983 unreasonable administrative search claim where, as here, the record reflected "a history of violations and complaints" and "the obvious potential for problems" at the searched business establishment. *Id.* at 236–37.

Finally, it is worth noting the stark difference between the Fourth Circuit panel's description of plaintiffs' *allegations* in this case and the *facts* supported by the current record—or, in some cases, assumed in plaintiffs' favor. Specifically, in holding that plaintiffs' complaint survived defendants' motion to dismiss, the panel described the complaint's allegations as follows:

> [Plaintiffs] allege that over fifty law enforcement officers, including six or seven ABC agents, participated in a search of RNR that lasted more than an hour. According to [plaintiffs], many of the officers were heavily armed SWAT team members dressed in full tactical gear. [Plaintiffs] also claim that RNR patrons and employees were ordered "against the wall to be searched by heavily armed officers," causing them to be "detained and terrorized." Finally, [plaintiffs] allege—in their briefs, but not their complaint—that these patrons and employees were held at gunpoint for over an hour.

*Id.* at 136 (internal citations omitted). Simply put, the current record does not support those allegations. In this respect, it is worth considering how that same description would read if adjusted to match the current record. Based on the undisputed facts and those disputed facts as read in plaintiffs' favor, that description would now read as follows (unsupported language ~~stricken~~ and replaced with supported language in *italics*):

> [Plaintiffs] allege that ~~over fifty~~ *fewer than forty* law enforcement officers, including six or seven ABC agents, participated in a search of RNR that lasted ~~more than~~ *less than* an hour. According to [plaintiffs], many of the officers were ~~heavily~~ armed ~~SWAT team members dressed in full tactical gear~~*, one held a shotgun, seven wore black ski masks, and several wore black gloves and bulletproof vests*. [Plaintiffs] also

-37-

claim that RNR patrons and employees were ordered ~~"against the wall to be searched by heavily armed officers,"~~ *to stay still as the officers entered and during the first half of the ABC inspection,* causing them to be ~~"detained and terrorized."~~ *delayed from playing pool and drinking beer for twenty-five minutes.* Finally, [plaintiffs] allege—in their briefs, but not their complaint—that these patrons and employees were ~~held at gunpoint~~ *in a room with armed officers who checked identification, searched one patron, and calmly conversed with other patrons and employees* for ~~over an hour~~ *approximately twenty-five minutes before the patrons resumed playing pool and drinking beer. Additionally, on entering RNR, one officer may have momentarily pointed a pistol at the bartender, and another officer, upon entering the upstairs office, pointed a pistol at David Ruttenberg while asking him to "please" get dressed and come downstairs.*

Given this comparison, it is pellucidly clear that, as the Fourth Circuit panel observed might be the case, "further factual development [has] show[n] that no constitutional violation occurred." *Id.* at 138.

In the end, it is important to remember that Fourth Amendment reasonableness inquiries "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Indeed, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. In this respect, although the Operation, given the facts known now, may not have been entirely necessary or perfectly tailored to the precise circumstances actually encountered, it was not constitutionally unreasonable in the circumstances.[41] Accordingly, because the Operation was reasonably conducted, defendants are entitled to summary judgment with respect to plaintiffs' Fourth Amendment claim, and Count III must be dismissed with prejudice.

---

[41] *See, e.g., Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (determining that a police operation, although neither perfect nor entirely necessary, did not constitute an excessive use of force), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007).

C.      **Each Defendant's Liability**

Even assuming, *arguendo*, that the current record warranted denying summary judgment on the question of whether the Operation was constitutionally unreasonable, plaintiffs would still be required to demonstrate that each defendant to Count III could be held liable for the constitutional violation at issue. In this respect, Count III alleges a Fourth Amendment claim against Chief Evans, Detective L, Detective W, and Kifer in both their individual and official capacities. Count III also alleges that the City, acting through Chief Evans and others, is municipally liable for the Operation's alleged constitutional unreasonableness. For the reasons that follow, even assuming that the Operation was unreasonably conducted, it is clear that Kifer, Detective W, Chief Evans, and the City cannot be held liable for the alleged constitutional violations. Genuine disputes of material fact remain, however, regarding whether Detective L could be held liable in his individual capacity absent qualified immunity were the Operation to be found constitutionally unreasonable.

First, plaintiffs have adduced no evidence that Kifer was acting under color of law on June 2, 2004. Indeed, although Kifer had signed a confidential informant agreement, the record does not reflect that he was being paid by law enforcement, nor does it suggest that he had any involvement in the planning or carrying out of the Operation. Accordingly, Kifer is entitled to summary judgment with respect to Count III, even assuming the Operation was unconstitutional.[42]

Next, with respect to Count III as brought against Detective W, Detective L, and Chief Evans in their individual capacities, it is important to observe that "[a]s a general matter, a law officer may

---

[42] It is worth noting that Kifer has not filed a motion for summary judgment; indeed, he has neither appeared, individually or by counsel, after the Fourth Circuit panel's opinion in this case. Plaintiffs have not provided any factual basis for his involvement in this case, however, and it thus appears that plaintiffs have abandoned Count III's allegations against Kifer.

incur § 1983 liability only through affirmative misconduct." *Randall v. Prince George's County*, 302 F.3d 188, 202 (4th Cir. 2002) (citing *Parratt v. Taylor*, 451 U.S. 527, 535–36 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)). In this respect, plaintiffs concede, as they must, that neither Detective W, nor Chief Evans, engaged in any affirmative act of misconduct; indeed, plaintiffs allege that only Detective L did so. Accordingly, for plaintiffs' claim to survive against Chief Evans and Detective W, plaintiffs must prove those defendants' culpability pursuant to either "bystander" or "supervisory" liability theories.

First, to prove "bystander" liability, a § 1983 plaintiff must prove that a defendant "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act." *Id.* at 203 (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)). In this respect, plaintiffs do not dispute that Chief Evans never entered RNR, nor do they dispute that Detective W exited RNR only a few minutes after commencement of the Operation. Accordingly, plaintiffs have adduced no evidence that Chief Evans or Detective W was confronted with a fellow officer's illegal act, and bystander liability is not warranted here.

Second, to prove "supervisory" liability, plaintiffs must prove each of the following elements:

(i)     "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff";

(ii)    "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices' "; and

(iii)   " that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

*Shaw v. Stroud*, 13 F.3d at 799 (4th Cir. 1994), *quoted in Randall*, 302 F.3d at 206. Again, plaintiffs

have not adduced any facts supporting a supervisory liability theory with respect to Chief Evans or

Detective W. As a threshold matter, the record contains no evidence suggesting that Detective W

was a supervisor of any kind, nor does it suggest that Chief Evans was a supervisor with respect to

the Operation. The record also does not reflect any actual or constructive knowledge by Chief Evans

of subordinates engaging in conduct posing a pervasive and unreasonable risk of constitutional

injury to citizens like plaintiffs, nor does it suggest the required deliberate indifference[43] and

affirmative causal link required to give rise to supervisory liability. Accordingly, even assuming the

Operation were constitutionally unreasonable, Chief Evans and Detective W are entitled to summary

judgment with respect to Count III as pled against them in their individual capacities.

   With respect to Count III's allegations against Detective L in his individual capacity, the

record does not clearly reflect whether Detective L, as the case agent who wrote the Plan, could be

held liable pursuant to direct, bystander, or supervisory liability. The parties disagree with respect

to both the length of time Detective L was inside RNR as well as his precise role in the Operation's

planning and supervision. Accordingly, assuming, *arguendo*, that the Operation was constitutionally

unreasonable, then Detective L would not be entitled to summary judgment on Count III absent

qualified immunity. *See infra* at Part III.D.

   Next, with respect to Count III's claims against the individual defendants in their official

capacities, it is important to observe that official-capacity suits " 'generally represent only another

way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham*,

---

   [43] It is worth noting that in *Randall*, the Fourth Circuit observed that *Shaw*'s deliberate
indifference prong is ordinarily not satisfied where a plaintiff " 'point[s] to a single incident or
isolated incidents . . . .' " *Randall*, 302 F.3d at 206 (quoting *Slakan v. Porter*, 737 F.2d 368, 373
(4th Cir. 1984)).

473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)); *see also Brandon v. Holt*, 469 U.S. 464, 471–72 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond."). Thus, the official-capacity claims against Detective L and Chief Evans, both City employees, are duplicative of plaintiffs' claims against the City and must be dismissed. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 n. 13 (4th Cir. 2006) (citing *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004)). With respect to the official-capacity suit against Detective W, a PWCPD officer, Count III only alleges that Detective W acted in his official capacity on behalf of the City, not Prince William County; accordingly, the official-capacity claims in Count III against Detective W are also duplicative and must be dismissed. *Id.*[44]

Finally, with respect to Count III's allegations against the City, it is well-settled that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 (emphasis in original), *cited in Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727 (4th Cir. 1999). Rather, a government entity is only responsible under § 1983 where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury . . . ." *Monell*, 436

---

[44] It is also worth noting that plaintiffs have never advanced any argument that Prince William County should be held liable, nor does the record suggest that Detective W, as a PWCPD detective, engaged in any actions with respect to the Operation that could give rise to liability against Prince William County. *See Amos v. Md. Dep't of Pub. Safety & Corr. Servs.*, 126 F.3d 589, 609 (4th Cir. 1997) (Where represented plaintiff "allege[s] capacity specifically by expressly pleading" it, plaintiff is bound by that pleading.), *vacated on other grounds by* 524 U.S. 935 (1998).

U.S. at 694. In this respect, plaintiffs do not argue that the City maintained any unconstitutional policy or custom; rather, they advance two theories of municipal liability against the City—namely, (i) that Chief Evans and the City failed to train adequately Detective L and its other officers who participated in the Operation, and (ii) that Chief Evans's actions regarding the Operation constituted a single decision by a final policymaking official sufficient to give rise to municipal liability. Although plaintiffs pled the first theory in their complaint, they neither advanced, nor addressed that theory in response to defendants' summary judgment motion; accordingly, it appears they have abandoned it, and it is unnecessary to address its merits here. With respect to the latter theory, plaintiffs must show that Chief Evans " 'possesse[d] final authority to establish municipal policy with respect to the action ordered.' " *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). In other words, the City cannot be held liable for Count III's allegations unless Chief Evans "speaks 'with final policymaking authority for the local governmental actor *concerning the action alleged to have caused the particular constitutional . . . violation at issue*.' " *Austin*, 195 F.3d at 729 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (emphasis added). In this case, the record does not reflect that Chief Evans spoke with final policymaking authority concerning the Operation; to the contrary, the record reflects that the Operation was supervised and managed by Detective L's NTF supervisors—all PWCPD officers. Thus, although it is possible that Chief Evans is the City's final policymaking authority in some cases, this is not such a case. Accordingly, even assuming the Operation was constitutionally unreasonable, the City would nonetheless be entitled to summary judgment with respect to Count III on the basis that plaintiff has adduced no evidence supporting a municipal liability theory.

-43-

**D.** **Whether Plaintiffs' Constitutional Rights Were Clearly Established**

Finally, even assuming that the Operation was constitutionally unreasonable and plaintiff could demonstrate that these defendants should be held liable, the officer defendants would still be entitled to summary judgment on qualified immunity grounds with respect to Count III's claims against them in their individual capacities unless the plaintiffs' "clearly established" constitutional rights were violated. *Ruttenberg*, 283 F. App'x at 138 (citing *Saucier*, 533 U.S. at 201). To be sure, as the Fourth Circuit panel observed, " '[t]here is no question that the Fourth Amendment prohibition of unreasonable searches . . . applies to the performance of administrative searches of commercial property.' " *Id.* (quoting *Turner*, 848 F.2d at 446). Of course, it is also true that the inquiry into whether a constitutional right is clearly established " 'must be undertaken in light of the *specific context* of the case, not as a broad general proposition.' " *Id.* (quoting *Saucier*, 533 U.S. at 201) (emphasis added). In this respect, the question is not whether "the facts of a previous case mirror in all respects those of the present case"; rather, the question is whether the officers' conduct, even if unconstitutional, " 'could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Id.* at 138, 139 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

In this case, even assuming the Operation violated plaintiffs' constitutional rights, it cannot fairly be said that those rights were clearly established. This is particularly so given the relative lack of Fourth Circuit authority on point, as well as the factual similarities between this case and *Crosby*. In any event, because the Operation was constitutionally reasonable, it is unnecessary to address whether the constitutional rights at issue, based on the context of this case, were clearly established. Accordingly, even assuming, *arguendo*, that the Operation was constitutionally unreasonable and

that any officer defendants should be held individually liable, those officer defendants would nonetheless be entitled to qualified immunity.

E.        **Plaintiffs' State Law Claims**

Finally, because all of plaintiffs' federal claims, over which there is jurisdiction pursuant to 28 U.S.C. § 1331, have been dismissed, plaintiffs' state-law claims in Counts VI, VII, VIII, will be dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c)(3). *See* 28 U.S.C. § 1367(c)(3) (permitting district courts to decline supplemental jurisdiction of state law claims where "the district court has dismissed all claims over which it has original jurisdiction"); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."), *cited in Mora v. City of Gaithersburg*, 519 F.3d 216, 231 (4th Cir. 2008).

For these reasons, defendants are entitled to summary judgment on Count III, which must be dismissed with prejudice, and Counts VI, VII, and VIII must be dismissed without prejudice.

An appropriate Order will issue.



                                                    _____/s/_____

Alexandria, Virginia                              T. S. Ellis, III
March 11, 2009                                    United States District Judge

-45-